278 Neb. 230
STATE OF NEBRASKA, APPELLEE,
v.
DAUNTE L. GOYNES, APPELLANT.
No. S-08-810.
Supreme Court of Nebraska.
Filed July 31, 2009.
Thomas C. Riley, Douglas County Public Defender, for appellant.
Jon Bruning, Attorney General, and James D. Smith for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
CONNOLLY, J.

I. SUMMARY
A jury convicted the appellant, Daunte L. Goynes, of murder in the second degree and use of a deadly weapon to commit a felony. The district court sentenced him to a term of 60 years' to life imprisonment for the murder conviction and a consecutive term of 10 to 20 years' imprisonment for the weapon conviction. He appeals the district court's exclusion of purported threats made against him by the victim's fellow gang members. He also appeals the court's denial of his motion for a mistrial for prosecutorial misconduct. We affirm.

II. BACKGROUND

1. THE SHOOTING
The State charged 18-year-old Goynes with second degree murder and use of a deadly weapon to commit a felony. Goynes admitted shooting 18-year-old Aaron Lofton but claimed self-defense.
The shooting occurred during a fight between Lofton and Goynes near 40th and Hamilton Streets in Omaha, Nebraska. Lofton and his mother were walking on Hamilton Street about 1 o'clock in the afternoon. Lofton's mother testified that as they walked past Goynes and another male, Lofton turned and punched Goynes in the face and a fight ensued. Lofton's mother ran to a nearby store for help. When she exited the store, she heard several shots. She did not see the first shot but claimed that she saw Goynes standing in the middle of the street, firing at Lofton as he ran away from Goynes.
Another witness, a cabdriver, was driving west on Hamilton Street when the shooting occurred. He testified that he saw a fight between two young black males. He saw Lofton throw the first punch and, as the fight escalated, heard shots. He did not see the first shot, but testified that he saw Lofton running away. As Lofton continued running, the cabdriver saw Goynes leaning over a parked car, firing with his hand extended across the hood. Lofton later died at a hospital.
Goynes and the other male fled from the scene. The cabdriver followed them to a house a few blocks away, where police arrested Goynes. At the house, the police found a .38caliber revolver. The gun, a five-shot revolver, had one empty cell and four spent casings in the other cells. Ballistics tests later confirmed that the fatal bullet was fired from the gun. An autopsy determined that a single shot entered Lofton's left side under his armpit and travelled left to right at a slight upward angle. The autopsy also showed the bullet lodged in the right side of Lofton's upper chest area. The parties stipulated that Goynes fired the shot from a distance of at least l2 inches.
Goynes testified that he did not seek out Lofton on the day of the shooting, but that Goynes recognized him as a member of the "Murdertown" gang. Goynes also testified that he was losing the fight with Lofton; that Lofton had him in a headlock; and that because Goynes suffers from asthma, the exertion and pressure were making it difficult for him to breathe. He began to panic and reached for the gun hidden in his pants. Goynes testified that he believed the only way to get free from Lofton was to shoot him. He testified that he fired several shots while he was on the ground but never shot at Lofton once he was free from him.
Goynes said that the fight was part of an ongoing dispute between himself and members of the Murdertown gang. He stated that a month before the shooting, Lofton shot at him and several friends while they were in Kountze Park in Omaha, and that later that same night at a local fast-food restaurant, a Murdertown gang member was murdered. Goynes testified that he was not responsible for the death but that he began carrying a gun because the Murdertown gang members blamed him for the shooting. He believed that his fight with Lofton resulted from the Murdertown gang's belief that he was involved in the fast-food restaurant shooting.

2. THE TRIAL

(a) Evidence of Alleged Third-Party Threats
During the trial, Goynes argued that he shot Lofton in self-defense. To establish that defense, Goynes attempted to introduce evidence of threats made against him by Lofton's fellow gang members. The court excluded this evidence. The first incident Goynes proffered as evidence involved a drive-by shooting at Goynes' mother's residence allegedly committed by Murdertown gang members. The second incident involved an alleged threat made by the Murdertown gang on the "MySpace" Web page, an online social networking site. Goynes argued that the threats showed he reasonably feared Lofton because Lofton was a member of the Murdertown gang.
Regarding the first incident, the district court allowed Goynes to testify that after the fast-food restaurant murder, he saw a car drive by his mother's house and he believed a Murdertown gang member owned it. But the court did not allow him to testify that someone fired shots from the car at his mother's house. The court ruled that unless Goynes could testify that Lofton was in the car, he could not testify about the shots' being fired from the car. In an offer of proof, Goynes argued that a jury could findbecause of the firing of shots at his mother's house by Murdertown gang membersthat he reasonably feared he would be killed or seriously injured by a Murdertown gang member.
Regarding the second incident, the court did not allow Goynes to introduce testimony regarding an alleged threat against Goynes and his family on Murdertown's Web page on "MySpace." In his offer of proof, Goynes alleged that he had "heard" that there was an alleged threat to kill him and his family on Murdertown's "MySpace" Web page. Goynes could not, however, link Lofton with the Web page or testify that Lofton was the one who put the threat on the Web page. Goynes also could not testify that he actually saw the purported threat, and the offer of proof did not contain a printout of the actual Web page. Moreover, Goynes could not explain how he became aware of the alleged threat or why he had a reasonable basis to believe the purported threat or that it was connected to Lofton.
The court held that the testimony was not admissible unless Goynes could connect Lofton with the Web page. The court did allow Goynes to testify that there was "something out there" on "MySpace" with Lofton's name, but that he did not know if Lofton was responsible for the information. Goynes argued the testimony regarding the "MySpace" threat would show the reasonableness of his fear of Murdertown gang members and that Lofton was the first aggressor.

(b) Goynes' Motion for Mistrial
The court denied Goynes' motion for a mistrial because of alleged prosecutorial misconduct. Goynes moved for a mistrial during the State's cross-examination of him while he was testifying about the gun used in the shooting.
On direct examination, he testified that he bought the gun only after Lofton shot at him at Kountze Park. On cross-examination, the prosecutor attempted to elicit testimony from Goynes about his previous gun ownership. The prosecutor asked him twice whether he was familiar with guns or whether he had previously owned a gun. After each question, defense counsel objected to the question as irrelevant and as inadmissible evidence of Goynes' previous criminal conduct. The court sustained both objections. The prosecutor then asked a third time whether Goynes had previously owned a gun. Defense counsel objected and moved for a mistrial. The court denied the motion, stating, "Let's move on."

III. ASSIGNMENTS OF ERROR
Goynes assigns the following errors:
(1) The court erred in excluding evidence that third parties associated with Lofton had made threats and committed acts of violence against Goynes.
(2) The court erred in denying his motion for a mistrial because of alleged prosecutorial misconduct.

IV. STANDARD OF REVIEW
[1] Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, we review the admissibility of evidence for an abuse of discretion.[1]
[2] The decision whether to grant a motion for mistrial is within the discretion of the trial court, and we will not disturb the ruling on appeal in the absence of an abuse of discretion.[2]

V. ANALYSIS

1. EVIDENCE OF THIRD-PARTY THREATS
Goynes claims that the court erred in excluding evidence of alleged third-party threats. Specifically, he contends that the court should have allowed him to introduce evidence of the drive-by shooting at his mother's residence and the alleged threat against him and his family on Murdertown's "MySpace" Web page. He argues that both pieces of evidence support his self-defense claim because they show why he reasonably feared Murdertown gang members and Lofton in particular as a member of the gang. He also argues the evidence demonstrates two additional points: why he was carrying a gun on the day of the shooting and that Lofton was the first aggressor.
[3] To successfully assert a claim of self-defense as justification for the use of force, the defendant must have a reasonable and good faith belief in the necessity of such force.[3] The force used must be immediately necessary and must be justified under the circumstances.[4] This necessarily means that the defendant asserting a claim of self-defense may introduce evidence why he or she was justified in being fearful of the alleged victim or that the alleged victim was the first aggressor.[5] Here, however, Goynes is not attempting to introduce evidence of threats made by Lofton. Instead, he is attempting to introduce evidence of third-party threats made by Lofton's fellow gang members.
We have not addressed the admissibility of threats which were made not by a victim, but by third parties associated with the victim. Other courts have held that evidence of third-party threats are admissible to support a claim of self-defense if there is also evidence from which the fact finder may find that the defendant reasonably connected the victim with those threats.[6] Assuming without deciding that third-party threats would be admissible in cases of self-defense, the district court did not err in excluding the testimony of the third-party threats.
Goynes claims that the evidence of the alleged third-party threats shows that he reasonably feared for his life. We understand this argument to be that because Lofton's gang members had threatened Goynes' life, he was reasonable in using deadly force against Lofton. Goynes' testimony, however, does not support that conclusion.
Goynes testified that he was not afraid of Lofton even though Lofton was a member of the Murdertown gang. And what most undermines Goynes' self-defense claim is his testimony that he shot Lofton not because he thought Lofton would kill him, but because he believed he was having a potentially lethal asthma attack while Lofton had him in a headlock. And remember, Goynes fired not one but four shots at Lofton as he was running away.
Goynes makes two other arguments: (1) The threats also show that Lofton was the first aggressor and (2) they explain why Goynes was carrying a gun on the day of the shooting. But this evidence was before the jury even without evidence of these specific threats. First, the court allowed Goynes to testify that Lofton started the fight. And second, the court allowed him to testify that "bad blood" existed between Goynes' and Lofton's gangs and that Goynes had purchased the gun for his protection. So, even if Goynes had linked this evidence to Lofton, his argument fails to persuade us that he was prejudiced by the exclusion of these threats. We conclude that the district court did not abuse its discretion in excluding the evidence relating to the alleged drive-by shooting and the alleged "MySpace" threat.

2. PROSECUTORIAL MISCONDUCT
Goynes testified that he purchased the gun only after the Kountze Park incident. On cross-examination, the prosecutor attempted to impeach his credibility by trying to elicit testimony that Goynes had in fact owned other guns before the incident. Goynes claims that because the court sustained his objections twice regarding his prior gun ownership, the prosecutor engaged in misconduct sufficient to support a mistrial when he asked a third time.
[4.5] The decision to grant a motion for mistrial is within the trial court's discretion.[7] Before it is necessary to grant a mistrial for prosecutorial misconduct, the defendant must show that a substantial miscarriage of justice has actually occurred.[8]
Goynes argues that the conduct was prejudicial because his credibility was critical to the issue of self-defense and that by seeking to impeach his credibility through improper questioning, the prosecutor deprived him of a fair trial. Of course, the State sees it differently. The State claims the prosecutor's questions were not inflammatory, but reflected a good faith effort to impeach Goynes' testimony.
[6-8] When a prosecutor persists in questioning after the court advises that the questions are not permitted, the prosecutor commits misconduct.[9] But the prosecutor's conduct does not require a mistrial if it does not mislead or unduly influence the jury.[10] Here, the question is whether the prosecutor's conduct is so inflammatory that an admonition to the jury cannot remove the contamination.[11]
The prosecutor's questions regarding Goynes' prior gun ownership came after the State had called 14 witnesses and rested. In addition, the court instructed the jury not to speculate on answers to questions that the court had overruled. But more important, the jury was aware from other testimony that through his gang, Goynes had previously been associated with guns. After the prosecutor's cross-examination of Goynes, in rebuttal, a police officer testified that Goynes told him that he was a member of the "38th Street Bloods" gang, that he associated with other gangs, and that he and other gang members "hang out" in Kountze Park, where "they hide their firearms in the trash can." Thus, the jury was aware that Goynes had contact with guns before the Lofton shooting.
Although the prosecutor should have retreated from his questioning sooner, in the grand scheme of things, we believe the jury would have little noted or long remembered the exchange. In sum, the prosecutor's conduct did not infect the jury. And so, despite the court's sustaining all objections to the State's questions regarding Goynes' previous gun ownership, the jury knew that Goynes had a gun before the Lofton shooting.
We conclude that the district court did not err in denying Goynes' motion for a mistrial.
AFFIRMED.
NOTES
[1] State v. Draganescu, 276 Neb. 448, 755 N.W.2d 57 (2008).
[2] See State v. Gresham, 276 Neb. 187, 752 N.W.2d 571 (2008).
[3] See State v. Iromuanya, 272 Neb. 178, 719 N.W.2d 263 (2006).
[4] See id.
[5] See State v. Lewchuk, 4 Neb. App. 165, 539 N.W.2d 847 (1995).
[6] People v. Minifie, 13 Cal. 4th 1055, 920 P.2d 1337, 56 Cal. Rptr. 2d 133 (1996).
[7] See State v. Gutierrez, 272 Neb. 995, 756 N.W.2d 542 (2007).
[8] Id.
[9] See, State v. Beeder, 270 Neb. 799, 707 N.W.2d 790 (2006), disapproved on other grounds, State v. McCulloch, 274 Neb. 636, 742 N.W.2d 727 (2007); State v. hotter, 255 Neb. 456, 586 N.W.2d 591 (1998) (citing State v. Gurule, 194 Neb. 618, 234 N.W.2d 603 (1975)).
[10] See id. See, also, Gutierrez, supra note 7.
[11] See Beeder, supra note 9. See, also, State v. Pierce, 231 Neb. 966, 439 N.W.2d 435 (1989).