## CONCLUSION

Based upon our de novo review of the record, the district court properly denied Paula's countercomplaint to modify, which had requested sole custody of Alexis and removal of Alexis to California. Therefore, the decision of the district court is affirmed.

AFFIRMED.

———————————

State of Nebraska, appellee, v.
William W. Matthews, appellant.
___ N.W.2d ___

Filed April 1, 2014.    No. A-12-1052.

1. **Constitutional Law: Statutes: Judgments: Appeal and Error.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility.

2. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion.

3. **Judges: Words and Phrases.** A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.

4. **Jury Instructions.** Whether jury instructions given by a trial court are correct is a question of law.

5. **Judgments: Appeal and Error.** When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.

6. **Self-Defense.** To successfully assert a claim of self-defense as justification for the use of force, the defendant must have a reasonable and good faith belief in the necessity of such force and the force used must be immediately necessary and must be justified under the circumstances.

7. ____. A determination of whether the victim was the first aggressor is an essential element of a self-defense claim.

8. **Self-Defense: Evidence: Proof.** Evidence of a victim's violent character is probative of the victim's violent propensities and is relevant to the proof of a self-defense claim.

9. **Rules of Evidence.** Neb. Rev. Stat. § 27-404 (Reissue 2008) provides that a defendant may present evidence of a pertinent trait of a victim's character to show that the victim acted in conformity therewith on a particular occasion.

10. **Rules of Evidence: Testimony.** In situations where testimony is allowed about a person's character trait, that trait may be shown by reputation and opinion testimony.

11. **Rules of Evidence: Proof.** Neb. Rev. Stat. § 27-405(2) (Reissue 2008) provides for proof of specific instances of conduct regarding a person's character or trait of character when the character or trait of character is an essential element of a charge, claim, or defense.

12. **Criminal Law: Juries: Evidence: Appeal and Error.** In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt.

13. **Criminal Law: Trial: Juries: Appeal and Error.** In a jury trial of a criminal case, harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant.

14. ____: ____: ____: ____. Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.

15. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested jury instruction, an appellant has the burden to show that the tendered instruction is a correct statement of the law, that the tendered instruction was warranted by the evidence, and that the appellant was prejudiced by the court's refusal to give the tendered instruction.

16. **Self-Defense.** To successfully assert a claim of self-defense, one must have a both reasonable and good faith belief in the necessity of using force. In addition, the force used in defense must be immediately necessary and must be justified under the circumstances.

17. **Jury Instructions: Evidence.** The trial court is not required to give the instruction where there is insufficient evidence to prove the facts claimed; however, it is not the province of the trial court to decide factual issues even when it considers the evidence produced in support of one party's claim to be weak or doubtful.

18. **Jury Instructions: Self-Defense: Evidence.** It is only when the evidence does not support a legally cognizable claim of self-defense or the evidence is so lacking in probative value, so as to constitute failure of proof, that the trial court may properly refuse to instruct the jury on the defendant's theory of self-defense.

19. **Appeal and Error.** Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.

20. **Convictions: Weapons: Intent.** When the felony which serves as the basis of the use of a weapon charge is an unintentional crime, the accused cannot be convicted of use of a firearm to commit a felony.

21. **Jury Instructions: Pleadings: Evidence.** Whether requested to do so or not, a trial court has the duty to instruct the jury on issues presented by the pleadings and the evidence. Because of this duty, the trial court, on its own motion, must correctly instruct on the law.

22. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from an erroneous jury instruction, a defendant has the burden to show that the instruction was prejudicial or otherwise adversely affected a substantial right of the defendant.

23. **Criminal Law: Evidence: New Trial: Appeal and Error.** Upon finding error in a criminal trial, the reviewing court must determine whether the evidence presented by the State was sufficient to sustain the conviction before the cause is remanded for a new trial.

24. **Double Jeopardy: Evidence: New Trial: Appeal and Error.** The Double Jeopardy Clause does not forbid retrial if the sum of the evidence offered by the State and admitted by the trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict.

Appeal from the District Court for Hall County: WILLIAM T. WRIGHT, Judge. Affirmed in part as modified, vacated in part, and in part reversed and remanded for a new trial.

Gerard A. Piccolo, Hall County Public Defender, and Matthew A. Works for appellant.

Jon Bruning, Attorney General, and Melissa R. Vincent for appellee.

INBODY, Chief Judge, and IRWIN and RIEDMANN, Judges.

INBODY, Chief Judge.

## I. INTRODUCTION

William W. Matthews appeals his jury convictions in Hall County District Court for attempted first degree murder, two counts of terroristic threats, and three counts of use of a deadly weapon to commit a felony. Matthews assigns that the district court erred by not allowing certain witness testimony and in the jury instructions tendered to the jury.

## II. STATEMENT OF FACTS

In August 2011, the State filed an information charging Matthews with six felonies involving several different victims in this case: count I, attempted first degree murder, and count II, use of a deadly weapon to commit a felony, involving

a victim, Kevin Guzman; count III, terroristic threats, and count IV, use of a deadly weapon to commit a felony, involving a second victim, Maira Sanchez; and count V, terroristic threats, and count VI, use of a deadly weapon to commit a felony, involving a third victim, Mariel Betancourt. In August 2012, the matter went to a jury trial, which lasted several days and included the testimony of numerous witnesses.

On April 21, 2011, Frank Casita Moreno, a deacon at a church in Grand Island, Nebraska, was driving to a rehearsal at his church when he observed a large crowd of Hispanic men and women in the alley between 11th and 12th Streets and two other people standing near a garage in the same vicinity. Within that group, Moreno observed an individual waving a gun at a woman, and Moreno then called the 911 emergency dispatch service. Moreno circled his vehicle around the block to get a better look at the scene, and the group had moved to the center of the street, where a Caucasian man pulled out a gun, waved it, and fired shots at the group standing on the east side of the street near the garage. Moreno described the shooter as a Caucasian man with "dirty blond" hair, wearing a gray sweater or hoodie, whom Moreno identified as Matthews. Moreno saw that the first man he observed with a gun still had the gun out, but that it was at his side and no longer pointed at the woman.

Helen Whitefoot also observed some of the activity discussed above on that day, indicating at trial that she saw guns waving and heard screaming, yelling, and an "intense" argument which led her to call 911. Whitefoot was waiting in a vehicle with her mother in the area and testified that she was looking down the alley toward Eddy Street when she noticed a male and female arguing and yelling and the male lifting his shirt to "flash the gun." Whitefoot explained that the couple was standing on the sidewalk near the front of a garage. Whitefoot testified that the man on the side of the street near the garage yelled, "'Bring it on . . . I'm packing,'" and removed a gun from his waistband, pointing it in the direction of the other side of the street. As she was dialing 911, two individuals ran into the middle of Eddy Street and one of them started shooting a gun into the air. Whitefoot saw one man fire one shot into the air, then drop the

gun down to "chest level" and point and shoot the gun at the male and female couple near the garage. Whitefoot first testified that she could not remember what the couple was doing at the time shots were fired, because she was focused on the man with the gun in the air. She later testified that the couple was facing the shooter as the gun was shot. During cross-examination, Whitefoot testified that she was unsure whether the couple proceeded down the alley before the shots were fired. Whitefoot observed that the shooter was male, wearing a gray, hooded sweatshirt and light-blue baggy jeans, and she identified the individual as Matthews.

On that same day, Dana Mora was at his home on the southwest corner of Eddy and 11th Streets when he heard a gunshot. Mora observed a man with a "nickel-plated, real shiny" gun, wearing a gray sweater with a "'U'" on the back, running away from a group of people. Mora testified that he saw this man raise his hand into the air, fire the gun two more times, and run off in a southwesterly direction. Mora observed that this man had "short, stubbly hair, [and a] goatee."

At trial, Guzman—the individual whom witnesses described as the first individual to show a gun at the scene on April 21, 2011, and one of the individuals standing near a garage in the alley—was a witness for the State, but near the beginning of his testimony, he stated, "You know something, I plead the 5th." After a short break and discussion regarding immunity, Guzman returned to the stand and testified that he had absolutely no recollection of being in Grand Island on April 21 and did not have any recollection of any of the events which took place at that time. Thereafter, Guzman's February 3, 2012, deposition was received into evidence in place of his testimony and was read to the jury.

Guzman's deposition testimony set forth that on April 21, 2011, Guzman and his girlfriend, Betancourt—the alleged victim in count V, terroristic threats, and count VI, use of a deadly weapon to commit a felony—decided to go to her cousin's house, which was located near 11th and 12th Streets, to relax. Guzman and Betancourt then walked to a gas station, and upon their return, Guzman noticed a large group of people, approximately 10 to 12 individuals, whom Guzman observed

to be around the ages of 18 and 19 years old. Guzman testified that the group "had been starting like all these problems with me and all that" and testified that the group was picking on him because its members did not like him. Guzman also indicated that one of the individuals had seen him earlier at the gas station and was talking "smack." The group was talking back and forth, threatening him, and Guzman indicated that a friend told him by telephone that members of the group were "going to get" him. Guzman testified that he wanted to take care of the matter by fighting the group. Guzman approached the group and began yelling and threatening its members. Guzman and Betancourt "went up to . . . Eddy Street" with several other individuals, both male and female. Guzman indicated that he had a gun with him on that day because members of the other group had previously threatened to kill him and he wanted to be prepared.

Guzman testified that as he and his group, which included Betancourt and two of her female friends whom Guzman referred to as "Air" and "Puerto Rican," stood near the garage, members of the group opposite him, with whom he had been talking back and forth, had a gun pointed toward him and were passing the gun back and forth amongst them. Guzman later identified the person referred to as "Air" as Betancourt's cousin, Sanchez, the alleged victim in count III, terroristic threats, and count IV, use of a deadly weapon to commit a felony. Guzman testified that the group opposite him consisted of three men, whom he referred to as "Julio," "MJ," and "Matthews," and that they were handling the gun. Guzman described that Matthews was wearing a gray sweater and blue pants. Guzman indicated that when Julio, MJ, and Matthews began to cross the street toward Guzman, Guzman showed his gun, and that when the group came closer to him, he pulled his gun from his waistband. Guzman testified that MJ pointed the other group's gun at Guzman and that Matthews attempted to knock Guzman's gun out of his hand and then took the other group's gun from MJ. Guzman testified that he was holding his gun in his right hand and was pointing it back and forth between Julio, MJ, and Matthews. Matthews came closer to Guzman and pointed the other group's gun at Guzman's face.

Guzman also testified that the three men of the other group were "talking shit to [Betancourt] too."

Guzman testified that he heard the police were on their way and that he then dropped his gun, turned his back, and began to walk away from the other group, when he heard gunshots and saw leaves falling from nearby bushes. Guzman testified that he heard MJ say to Matthews, as the groups were dispersing, "'Shoot it, so they can see we don't play around.'" On cross-examination, Guzman admitted that he was the first to show his gun during the incident, but stated that he did not fire his weapon at any time.

Miguel Lemburg, Jr., testified that his nickname was "MJ" and that most of his friends referred to him that way. Lemburg testified that he was friends with Matthews but did not frequently hang out with him because in April 2011, Lemburg was on house arrest. However, Lemburg explained that on April 21, he went with Matthews and another friend he called Jaime to the intersection of 11th and Eddy Streets because there was going to be a fight, not between any specific people but "just like people going back and forth, talking shit to each other." Lemburg and numerous others, including Matthews, went to the location to look for someone named "Kevin," i.e., Guzman. Eventually, Guzman arrived on the scene and started threatening Lemburg and his group, which threats were reciprocated. Lemburg testified that Guzman flashed his gun by lifting up his shirt, showing that the gun was tucked in his waistband. Lemburg testified that Guzman was by himself when Lemburg, Matthews, and Jaime crossed the street, walking toward Guzman. Lemburg testified that he was trying to get Guzman to put the gun down and fight, but that another gun "came out" first. Lemburg testified that he did not know who had the second gun, but that he, Matthews, and Jaime were the only people in the street. Lemburg testified that on that day, he was wearing a "Freddy's" shirt. Lemburg testified that Matthews was wearing a gray shirt or sweater and blue pants and that Jaime was wearing a black shirt or sweater.

Lemburg recalled giving testimony at a deposition that Matthews had the gun, but did not remember having made a

similar statement that he saw Matthews both hold and shoot the gun. Lemburg then indicated that he had stated in his deposition that he had seen, out of the corner of his eye, Matthews shooting the gun and that Guzman was not in the area when the gun was fired.

Betancourt, who was Guzman's girlfriend at the time of the incident, testified that on April 21, 2011, Guzman had gotten into a fight with a group of men, including Matthews. Betancourt testified that she did not see either Guzman or Matthews with a gun on that day. As she and Guzman were walking away, Betancourt heard gunshots and saw leaves falling from a nearby bush. Betancourt's cousin indicated that Sanchez and another woman were also with Betancourt and him on April 21. Betancourt's cousin also testified that the group was walking back to his home when he heard gunshots.

An investigator who was with the Grand Island police department in April 2011 testified that approximately a week after the shooting, he interviewed Matthews. Matthews initially denied any involvement in the incident, but eventually admitted that he was at the scene. Matthews told the investigator that there was supposed to be a fight between Jaime and Guzman near 11th and Eddy Streets. Matthews indicated that Guzman came down the alley and that Guzman produced a semiautomatic pistol from his waistband. Matthews then indicated that he and Lemburg walked across the street to confront Guzman, who began waving his gun around at people, and that Guzman pointed his gun directly at Matthews' face. Matthews eventually also indicated to the investigator that Jaime had produced a gun and crossed the street toward Guzman with the gun, which led to Jaime's shooting the gun. Matthews reported that no one else had handled the second gun at any time during the incident. The investigator testified that Matthews gave him three different stories about the events that unfolded. The investigator testified that he responded to the scene on April 21 and that no bullet holes were found and no bullets retrieved, but that three bullet casings were found near the middle of Eddy Street.

The matter was submitted to the jury, which returned a unanimous verdict finding Matthews guilty of all six charges.

On count I, attempted first degree murder of Guzman, the district court sentenced Matthews to 3 to 5 years' imprisonment to be served concurrently with the sentences for counts III and V, but consecutively to those for counts II, IV, and VI. On counts II, IV, and VI, use of a deadly weapon to commit a felony, the district court sentenced Matthews to 5 to 5 years' imprisonment to be served consecutively to all other sentences pursuant to the statutory mandatory minimum. On counts III and V, terroristic threats against Sanchez and Betancourt, respectively, the district court sentenced Matthews to terms of 20 to 60 months' imprisonment to be served concurrently with each other and the sentence for count I and consecutively to the sentences for counts II, IV, and VI. The district court further ordered that Matthews was entitled to 562 days' credit "for time already served on each Count." Matthews has now timely appealed to this court.

## III. ASSIGNMENTS OF ERROR

Matthews assigns that the trial court erred by not allowing one of the witnesses to testify about aggressiveness and violence and by not including a self-defense element within the terroristic threats jury instructions.

## IV. STANDARD OF REVIEW

[1-3] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *State v. Scott*, 284 Neb. 703, 824 N.W.2d 668 (2012); *State v. Vigil*, 283 Neb. 129, 810 N.W.2d 687 (2012). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *State v. Scott, supra*; *State v. Vigil, supra*. A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *State v. Burton*, 282 Neb. 135, 802 N.W.2d 127 (2011).

[4,5] Whether jury instructions given by a trial court are correct is a question of law. *State v. Robinson*, 278 Neb. 212, 769 N.W.2d 366 (2009). When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below. *State v. Fischer*, 272 Neb. 963, 726 N.W.2d 176 (2007).

## V. ANALYSIS

### 1. Character Evidence

Matthews argues that the district court erred by not allowing Guzman to testify as to his own aggressive and violent characteristics and references the following colloquy:

> [Matthews' counsel:] . . . [Y]ou had mentioned before that you were under the — well, you were constantly under the influence of alcohol and drugs in April of 2011. Am I correct?
>
> [Guzman:] Yes.
>
> [Matthews' counsel:] In your opinion, did that state of affairs in April of 2011 make you aggressive?
>
> [The State]: Objection, Your Honor. Improper character evidence, improper opinion, it's irrelevant, improper under 404, and unfairly prejudicial over 403.
>
> THE COURT: Objection is sustained.
>
> [Matthews' counsel to Guzman:] . . . [A]gain, in April of 2011, did those circumstances, being under the influence of drugs and alcohol, make you, in your opinion, violent?
>
> [The State]: Objection, Your Honor.
>
> THE COURT: Sustained.

In Matthews' offer of proof to the court, he sought to introduce testimony by Guzman, who was the alleged victim in count I, attempted first degree murder, that in Guzman's own opinion, being under the influence of drugs in April 2011 had made him aggressive. In support of his argument, Matthews relies on the case of *State v. Sims*, 213 Neb. 708, 331 N.W.2d 255 (1983), for his proposition that Neb. Rev. Stat. § 27-405 (Reissue 2008) allows for evidence of a victim's character,

specifically evidence of the victim's tendencies of violence and aggression, to be admissible in a self-defense case.

[6,7] To successfully assert a claim of self-defense as justification for the use of force, the defendant must have a reasonable and good faith belief in the necessity of such force and the force used must be immediately necessary and must be justified under the circumstances. *State v. Goynes*, 278 Neb. 230, 768 N.W.2d 458 (2009). A determination of whether the victim was the first aggressor is an essential element of a self-defense claim. *State v. Kinser*, 259 Neb. 251, 609 N.W.2d 322 (2000). Matthews defended on the basis that he shot his gun in self-defense; that is, his actions in shooting the gun were justified because he used only such force as he believed necessary to protect himself.

[8-11] Evidence of a victim's violent character is probative of the victim's violent propensities and is relevant to the proof of a self-defense claim. *State v. Lewchuk*, 4 Neb. App. 165, 539 N.W.2d 847 (1995). Neb. Rev. Stat. § 27-404 (Reissue 2008) provides that a defendant may present evidence of a pertinent trait of a victim's character to show that the victim acted in conformity therewith on a particular occasion. *State v. Lewchuk, supra*. In situations where testimony is allowed about a person's character trait, that trait may be shown by reputation and opinion testimony. § 27-405(1); *State v. Lewchuk, supra*. Section 27-405(2) provides for proof of specific instances of conduct regarding a person's character or trait of character when the character or trait of character is an essential element of a charge, claim, or defense. *State v. Lewchuk, supra*.

Under § 27-405(2), proof of Guzman's propensity for aggressiveness and violence is relevant to whether he was the first aggressor, which is an essential element of Matthews' self-defense claim, and, as such, may be proved by evidence of Guzman's conduct. Therefore, the proffered testimony of Guzman was relevant to, and probative of, the question as to whether Guzman was the first aggressor. The trial court erred in not admitting Guzman's testimony.

[12-14] In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the

State demonstrates that the error was harmless beyond a reasonable doubt. *State v. Epp*, 278 Neb. 683, 773 N.W.2d 356 (2009). In a jury trial of a criminal case, harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant. *Id*. Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *Id*.

In Matthews' case, the jury was presented with conflicting evidence about the events surrounding the shooting; on one hand, the jury was presented with facts that Guzman was walking away from Matthews when the shots were fired, and on the other hand, the jury was also provided with facts that indicated that Guzman was standing directly in front of Matthews at the time of the shooting. The trial court found that there was enough evidence to instruct the jury as to the issue of self-defense and the use of deadly force, to which instruction the State did not object. Given the conflicting testimony that was presented to the jury, the exclusion of the testimony that, in Guzman's own opinion, his being under the influence of drugs in April 2011 had made him aggressive was prejudicial to Matthews. The State has failed to demonstrate that the error was harmless beyond a reasonable doubt. Therefore, Matthews did not receive a fair trial on counts I and II and his convictions on count I, attempted first degree murder, and count II, use of a deadly weapon to commit a felony, are reversed; the sentences are vacated; and we remand the cause for a new trial on those counts.

## 2. Jury Instructions

### (a) Self-Defense and Terroristic Threats

Matthews contends that the district court also erred by failing to include a self-defense element in the terroristic threats jury instructions. Matthews argues that he was defending himself with the gun against Guzman and that in the course of

defending himself against Guzman, he committed terroristic threats against the two female bystanders standing in the group near Guzman, namely Sanchez and Betancourt.

[15] To establish reversible error from a court's refusal to give a requested jury instruction, an appellant has the burden to show that the tendered instruction is a correct statement of the law, that the tendered instruction was warranted by the evidence, and that the appellant was prejudiced by the court's refusal to give the tendered instruction. See *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997).

[16-18] To successfully assert a claim of self-defense, one must have a both reasonable and good faith belief in the necessity of using force. *State v. Kinser, supra*; *State v. White*, 249 Neb. 381, 543 N.W.2d 725 (1996), *overruled on other grounds, State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998). In addition, the force used in defense must be immediately necessary and must be justified under the circumstances. *State v. Kinser, supra*. The trial court is not required to give the instruction where there is insufficient evidence to prove the facts claimed; however, it is not the province of the trial court to decide factual issues even when it considers the evidence produced in support of one party's claim to be weak or doubtful. *Id*. It is only when the evidence does not support a legally cognizable claim of self-defense or the evidence is so lacking in probative value, so as to constitute failure of proof, that the trial court may properly refuse to instruct the jury on the defendant's theory of self-defense. See *id*.

At the jury instruction conference, Matthews requested that an element of self-defense be added to the instructions regarding the two counts of terroristic threats, against Sanchez and Betancourt. Matthews did not offer any proposed instructions for self-defense because he thought it should be applied to terroristic threats. Matthews' counsel argued that Matthews was going either to be shot by Guzman or to commit terroristic threats by shooting his gun toward Sanchez and Betancourt and that he chose the lesser of two evils. The district court overruled the motion, finding that such additions were inappropriate because the victims named in the terroristic threats were two women, Sanchez and Betancourt, who were in

the area at the time of the incident, and not Guzman, who had allegedly been pointing his gun at Matthews. In its jury instructions, the district court included a separate jury instruction regarding self-defense, but that instruction was as to deadly force and the attempted murder charge, not the terroristic threats charges.

As to the terroristic threats charges in counts III and V, the jury instruction given by the district court was as follows:

### COUNT III

**The elements of Terroristic Threats that the State must prove are:**

1. That . . . Matthews . . . threatened to commit a crime of violence, that is, threatened [the victim].

2. That . . . Matthews . . . did so with the intent to terrorize [the victim] or in reckless disregard of the risk of causing such terror.

3. That . . . Matthews. . . did so on or about April 21, 2011, in Hall County, Nebraska.

The two jury instructions for counts III and V regarding terroristic threats are identical, with the exception of a change in the name of the victim.

The specific issue of jury instructions involving self-defense and terroristic threats has not often been discussed in Nebraska case law, although in *State v. Oldenburg*, 10 Neb. App. 104, 628 N.W.2d 278 (2001), the issue was indirectly touched upon. In *State v. Oldenburg*, the defendant was charged with making terroristic threats, first degree assault, and use of a deadly weapon in the commission of those crimes, which stemmed from an incident in which the defendant pointed a gun at her husband while he was charging her and, while doing so, shot and seriously injured him. Prior to deliberations, the jury was instructed on the elements of terroristic threats, and a self-defense instruction was given for the terroristic threats charge, which instruction was the self-defense instruction for instances where no deadly force was used. *Id*. The Nebraska Court of Appeals did not address the possible error of instructing the jury on self-defense, because no error had been assigned on appeal, although the court did find that "the pointing of a gun, even if doing so is not the use of deadly force, can be a threat

to commit a crime of violence and hence can be a terroristic threat under § 28-311.01." *State v. Oldenburg*, 10 Neb. App. at 121, 628 N.W.2d at 290.

In Matthews' case, a review of the record indicates that the instructions tendered for the terroristic threats charges were a correct statement of the law and were also warranted by the evidence presented at trial, such that the record indicates that Matthews was waving and pointing his gun toward the group in which Sanchez and Betancourt were standing, and there was not a single piece of evidence presented that either of those victims was, at any time, in possession of any weapon.

Based upon the facts of this case, we find that the self-defense instructions were not warranted as they pertain to the terroristic threats charges, and the district court's refusal to add an additional element of self-defense to the terroristic threats instructions did not prejudice Matthews. Matthews' argument that he did not intend to execute his threats, but merely intended to show that he would defend himself, is irrelevant because the crime of terroristic threats does not require intent to execute the threats made and does not require that the victim be actually terrorized. See *State v. Saltzman*, 235 Neb. 964, 458 N.W.2d 239 (1990). Furthermore, pointing a gun at a person can constitute criminal assault. See, generally, *State v. Kistenmacher*, 231 Neb. 318, 436 N.W.2d 168 (1989); *State v. Machmuller*, 196 Neb. 734, 246 N.W.2d 69 (1976); *State v. Brauner*, 192 Neb. 602, 223 N.W.2d 152 (1974). Therefore, we find that the district court did not commit prejudicial error by refusing to add an additional element of self-defense to the terroristic threats instructions.

### (b) Plain Error

Although not asserted on appeal by either Matthews or the State, upon our review of the record, it is apparent that further inquiry into Matthews' convictions for use of a deadly weapon to commit a felony in counts IV and VI is necessary.

[19] Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the

integrity, reputation, and fairness of the judicial process. *State v. Williams*, 282 Neb. 182, 802 N.W.2d 421 (2011); *State v. Simnick*, 279 Neb. 499, 779 N.W.2d 335 (2010).

[20] When the felony which serves as the basis of the use of a weapon charge is an unintentional crime, the accused cannot be convicted of use of a firearm to commit a felony. *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013); *State v. Sepulveda*, 278 Neb. 972, 775 N.W.2d 40 (2009). Therefore, the problem arises that if an unintentional act by Matthews was the predicate felony for the charges of use of a firearm to commit a felony, Matthews could not be convicted of those charges.

In *State v. Rye*, 14 Neb. App. 133, 705 N.W.2d 236 (2005), a jury found the defendant guilty of terroristic threats and use of a weapon to commit a felony. The trial court instructed the jury that the defendant could be guilty of terroristic threats if he threatened to commit any crime of violence, either with the intent to terrorize the victim or in reckless disregard of the risk of terrorizing the victim. *Id*. The jury was further instructed that if it found the defendant guilty of terroristic threats, but without any differentiation between intentional and reckless threats, then the defendant could be found guilty of use of a weapon to commit a felony if he used the firearm to commit the terroristic threats. *Id*. This court affirmed the terroristic threats conviction, but determined that because the trial court's instructions to the jury did not require a specific finding that the underlying felony for the use of a weapon charge was an intentional crime, the conviction on the use charge should be reversed and the cause should be remanded for a new trial on that charge. *Id*. Specifically, the court found that "because a reckless terroristic threat is an unintentional crime, it cannot be the underlying felony for the use of a weapon charge." *Id*. at 140, 705 N.W.2d at 244.

[21] "Whether requested to do so or not, a trial court has the duty to instruct the jury on issues presented by the pleadings and the evidence." *State v. Contreras*, 268 Neb. 797, 804, 688 N.W.2d 580, 585 (2004). "Because of this duty, the trial court, on its own motion, must correctly instruct on the law." *State v. Weaver*, 267 Neb. 826, 832, 677 N.W.2d 502, 508 (2004).

In the case at hand, the jury instructions regarding terroristic threats for counts III and V provided that the State was required to prove that Matthews made such threats "with the intent to terrorize another person or in reckless disregard of the risk of causing such terror" and did not require that the jury specifically make a separate finding as to whether the threats were intentional or reckless in accordance with the terroristic threats statute. See Neb. Rev. Stat. § 28-311.01 (Reissue 2008). Therefore, the trial court erred in giving jury instructions that allowed the jury to convict Matthews of the charges of use of a deadly weapon to commit a felony without finding that he threatened to commit a crime of violence with the intent to terrorize the victims.

[22] However, to establish reversible error from an erroneous jury instruction, a defendant has the burden to show that the instruction was prejudicial or otherwise adversely affected a substantial right of the defendant. See *State v. McGuire*, 286 Neb. 494, 837 N.W.2d 767 (2013). Harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant. *State v. Pangborn*, 286 Neb. 363, 836 N.W.2d 790 (2013); *State v. Ford*, 279 Neb. 453, 778 N.W.2d 473 (2010).

In this case, evidence was presented that during the confrontation between the two groups, Matthews had a gun in his hand which he was waving back and forth at the individuals standing with Guzman. A jury could find that this act was intended to terrorize the victims. However, Matthews asserted the defense of self-defense and in doing so admitted that he was defending himself with the gun against Guzman and that in the course of defending himself against Guzman, he committed terroristic threats against the two female bystanders standing in the group near Guzman, namely Sanchez and Betancourt; this may permit a fact finder to conclude that Matthews had threatened to commit a crime of violence in reckless disregard of the risk of terrorizing the victims. Because the evidence presented in this case is sufficient to convict Matthews of either intentional or reckless terroristic threats, a differentiation that does not

impact the statutory penalty, the terroristic threats jury instructions did not prejudice Matthews and were harmless error. Therefore, we affirm Matthews' convictions on counts III and V, terroristic threats.

While the failure to differentiate between whether Matthews acted intentionally or recklessly did not affect the terroristic threats charges, as was the case in *State v. Rye*, 14 Neb. App. 133, 705 N.W.2d 236 (2005), it is not harmless error as to the use of a deadly weapon charges in counts IV and VI. Because the underlying crime for a use of a deadly weapon conviction must be intentional, and no such finding was made, it was error for the trial court not to instruct the jury that in order to find Matthews guilty of the use of a deadly weapon charges, the jury must first determine that the terroristic threats were intentional.

[23,24] Upon finding error in a criminal trial, the reviewing court must determine whether the evidence presented by the State was sufficient to sustain the conviction before the cause is remanded for a new trial. *State v. Anderson*, 258 Neb. 627, 605 N.W.2d 124 (2000), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007); *State v. Rye, supra*. The Double Jeopardy Clause does not forbid retrial if the sum of the evidence offered by the State and admitted by the trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict. *State v. Haltom*, 263 Neb. 767, 642 N.W.2d 807 (2002), *disapproved on other grounds, State v. McCulloch, supra*.

Although there is evidence in this case to sustain a conviction on either reckless or intentional threats, the use of a deadly weapon convictions must be reversed, because only a conviction of intentional terroristic threats will serve as a predicate underlying felony for such a conviction. Therefore, we reverse Matthews' convictions for use of a deadly weapon on counts IV and VI, vacate his sentences thereon, and remand the cause for a new trial on those counts. See *State v. Brown*, 258 Neb. 330, 603 N.W.2d 419 (1999) (if trial court fails to adequately instruct jury but reviewing court finds sufficient evidence to convict, cause may be remanded to trial court for new trial).

### 3. Credit for Time Served

In its brief, the State asserts that the district court committed plain error by applying 562 days of credit for time served to each of Matthews' sentences. The State contends that the court should have applied the credit against only one sentence and requests that the sentence be modified to show only one credit of the 562 days. Therefore, we shall review Matthews' sentences for plain error.

Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Williams*, 282 Neb. 182, 802 N.W.2d 421 (2011); *State v. Simnick*, 279 Neb. 499, 779 N.W.2d 335 (2010).

At the sentencing hearing, on count I, attempted first degree murder, the district court sentenced Matthews to 3 to 5 years' imprisonment to be served concurrently with the sentences for counts III and V, but consecutively to those for counts II, IV, and VI; on counts II, IV, and VI, use of a deadly weapon to commit a felony, the district court sentenced Matthews to 5 to 5 years' imprisonment to be served consecutively to all other sentences pursuant to the statutory mandatory minimum; and on counts III and V, terroristic threats, the district court sentenced Matthews to terms of 20 to 60 months' imprisonment to be served concurrently with each other and the sentence for count I and consecutively to the sentences for counts II, IV, and VI. The district court then indicated that Matthews was "entitled to credit on all counts, or on each count individually of 562 days." After the pronouncement, the State questioned the credit portion of the sentences, but did not formally object. The sentencing order further indicates that the district court ordered Matthews to be "given 562 days credit for time already served on each Count." (Emphasis in original.)

Neb. Rev. Stat. § 83-1,106(1) (Reissue 2008) provides that "[c]redit against the maximum term and any minimum term shall be given to an offender for time spent in custody as a result of the criminal charge for which a prison sentence

is imposed or as a result of the conduct on which such a charge is based." In *State v. Banes*, 268 Neb. 805, 811-12, 688 N.W.2d 594, 599 (2004), the Nebraska Supreme Court determined that under § 83-1,106, "an offender shall be given credit for time served as a result of the charges that led to the sentences; however, presentence credit is applied only once." See, also, *State v. Williams, supra*.

Instead of crediting Matthews' time served against each count as the district court did, the court in this case should have credited the 562 days served against only the first count, thereby crediting 562 days against the aggregate of the minimum and the aggregate of the maximum sentences imposed. We therefore modify the sentencing order to state that Matthews is entitled to a credit for time served in the amount of 562 days against the aggregate of the minimum and the aggregate of the maximum sentences of imprisonment. See, *State v. Williams*, *supra*; *State v. Banes*, *supra*.

## VI. CONCLUSION

In sum, we conclude that the district court committed error by failing to allow Guzman to testify as to his violent and aggressive tendencies and that the error was prejudicial to Matthews. Therefore, we reverse the judgments of conviction for count I, attempted first degree murder, and count II, use of a deadly weapon to commit a felony; vacate the two sentences thereon; and remand the cause for a new trial on both charges.

We affirm Matthews' terroristic threats convictions and sentences and the district court's denial of Matthews' request to include an element of self-defense in the terroristic threats jury instructions for counts III and V. However, we find that the trial court failed to instruct the jury that in order for it to find Matthews guilty of the two charges of use of a deadly weapon in counts IV and VI, the underlying felonies of terroristic threats must have been intentional crimes and not just crimes in reckless disregard. As such, we also reverse the use of a deadly weapon convictions as to counts IV and VI, vacate those sentences, and remand the cause for a new trial on those use of a deadly weapon charges. Further,

we modify the sentencing order to state that Matthews is entitled to credit for time served in the amount of 562 days against the aggregate of the minimum and the aggregate of the maximum sentences of imprisonment and not as to each sentence individually.

AFFIRMED IN PART AS MODIFIED, VACATED
IN PART, AND IN PART REVERSED AND
REMANDED FOR A NEW TRIAL.

————————————

OAK HILLS HIGHLANDS ASSOCIATION, INC., APPELLANT, v.
SCOTT LeVASSEUR, PERSONAL REPRESENTATIVE OF
THE ESTATE OF WILLIAM LeVASSEUR, SR.,
ET AL., APPELLEES.

___ N.W.2d ___

Filed April 1, 2014.    No. A-12-1173.

1. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's granting of summary judgment if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.
2. ____: ____. In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.

Appeal from the District Court for Douglas County: PETER C. BATAILLON, Judge. Reversed and remanded for further proceedings.

Ben Thompson, of Thompson Law Office, P.C., L.L.O., for appellant.

Albert M. Engles and James C. Boesen, of Engles, Ketcham, Olson & Keith, P.C., for appellee Scott LeVasseur, as personal representative.

INBODY, Chief Judge, and MOORE and RIEDMANN, Judges.